# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Dependency of )
V.K.F., )  No. 70700-1-I
D.O.B.: 12/10/10, )
)  DIVISION ONE
A minor child. )
)  UNPUBLISHED OPINION
GALINA FRALEY, )
)
Appellant, )
)
v. )
)
STATE OF WASHINGTON )
DEPARTMENT OF SOCIAL AND )
HEALTH SERVICES, )
)  FILED: June 9, 2014
Respondent. )

TRICKEY, J. — Galina Fraley appeals from the trial court's dependency and dispositional orders placing her daughter, V.K.F., in out-of-home care and requiring supervised visitation during the dependency. We conclude that substantial evidence supported the challenged findings of fact and that the trial court properly exercised its broad discretion to ensure V.K.F.'s welfare. Finding no error, we affirm.

## FACTS

Mark and Galina Fraley married in July 2010.[1] Galina had four children from a previous marriage who currently reside with their father.[2] The couple's first child, V.K.F., was born on December 10, 2010.[3] V.K.F. is the subject of this

---

[1] 1 Report of Proceedings (RP) at 48, 53. For clarity, the parties will be referred to by their first names.
[2] 1 Report of Proceedings (RP) at 12-13; CP at 181.
[3] Clerk's Papers (CP) at 180.

appeal.

Over the past several years, Child Protective Services (CPS) has received numerous referrals of abuse or neglect concerning Galina's children.[4] Since V.K.F.'s birth, CPS determined that three referrals were "founded."[5] The first founded referral alleged severe dental neglect of one of V.K.F.'s half siblings and unsanitary conditions of the home.[6] The second founded referral alleged that domestic violence had taken place in December 2011, while V.K.F. was present.[7] The third founded referral, made in December 2012, alleged neglect of Galina's children.[8] That referral also alleged sexual abuse by Mark, but the Department of Social and Health Services (Department) determined that this allegation was unfounded.[9] The family was offered services on a voluntary basis following referrals in 2010, 2011, and 2012.[10]

On October 25, 2012, Mark was arrested after physically assaulting Galina at their home.[11] Whatcom County Deputy Terrance Brown responded to the report of assault.[12] When he arrived at the home, Galina was there with her brother and sister.[13] Galina informed Deputy Brown that Mark pushed her down

---

[4] 3 RP at 92.
[5] 3 RP at 92-93. "**Founded'** means the determination following an investigation by CPS that based on available information it is more likely than not that child abuse or neglect did occur." WAC 388-15-005.
[6] 3 RP at 93.
[7] 1 RP at 135-36; 3 RP at 93-94.
[8] 1 RP at 142, 155; 3 RP at 94.
[9] 1 RP at 143, 145; 3 RP at 94.
[10] 1 RP at 151.
[11] 1 RP at 45; 2 RP at 66.
[12] 2 RP at 126, 128.
[13] 2 RP at 128-29.

to the floor and threatened to punch her.[14] He then pushed her against a piece of furniture in the bedroom.[15] Deputy Brown observed injuries on Galina's shoulder that he believed were consistent with her report of assault.[16] All five of Galina's children were home during the assault.[17]

That night, Galina signed a voluntary statement composed by Deputy Brown.[18] The statement contained Galina's verbal narrative of the events that had transpired that night.[19] It also indicated that in the previous three months, Mark had pushed, hit, and threatened Galina.[20] According to the statement, Mark had become increasingly abusive over the past three months.[21] By the third month, he was abusing Galina every other day.[22] The statement additionally described an incident of physical assault that occurred shortly before October 25.[23] All five of Galina's children witnessed this assault.[24]

As a result of the October 2012 assault, a no contact order was put in place, prohibiting Mark from contacting Galina.[25] Galina and Mark separated, and at the time of the dependency proceedings, they were not living together.[26]

On January 4, 2013, the Department filed a dependency petition as to

[14] 2 RP at 129.
[15] 2 RP at 129.
[16] 2 RP at 129.
[17] 1 RP at 55.
[18] 2 RP at 130; Exhibit (Ex.) 1.
[19] 2 RP at 130; Ex. 1.
[20] 1 RP at 41; Ex. 1.
[21] Ex. 1.
[22] Ex. 1.
[23] Ex. 1.
[24] Ex. 1.
[25] 1 RP at 87-88; 3 RP at 120-21.
[26] 1 RP at 119.

V.K.F.[27] A dependency fact-finding hearing was held in April and May 2013.

At the hearing, Galina presented testimony describing the October 2012 assault.[28] Although Galina testified that she had invited her brother and sister over earlier that night because she was worried for her safety, she denied that she had ever been fearful of Mark.[29] She also denied an ongoing pattern of domestic abuse by Mark.[30] Galina further denied most of the statements included in the voluntary statement, claiming that prior to October of that year, Mark had not abused her.[31] According to Galina's testimony, the voluntary statement was based on her sister's exaggerated report to Deputy Brown.[32]

The Department offered the testimony of Dr. Walter Uhl, a clinical psychologist.[33] Dr. Uhl conducted a psychological evaluation of Galina in April 2012.[34] He testified that during the evaluation, Galina depicted her father as a domineering, harsh disciplinarian who beat Galina and her siblings when they "acted out."[35] Galina also told Dr. Uhl that her former husband had physically abused her.[36]

Bryan May, Mark's domestic violence treatment provider, testified that he

---

[27] 1 RP at 145, 147-48; CP at 6.
[28] 1 RP at 40.
[29] 1 RP at 42, 57.
[30] 1 RP at 41.
[31] 1 RP at 41, 60-65, 68-69.
[32] 1 RP at 41-43.
[33] 2 RP at 82-83.
[34] 2 RP at 90-91.
[35] 2 RP at 93.
[36] 2 RP at 95.

performed an evaluation of Mark in March 2013.[37] May determined that there was a high likelihood that Mark minimized the severity of the abuse he perpetrated.[38] May also found that there was a high likelihood that Mark would be abusive in the future without intervention.[39] At the time of the hearing, Mark was seeking treatment from May and had completed 6 out of 32 sessions.[40]

On May 2, 2013, the trial court entered a dependency order, finding V.K.F. dependent pursuant to RCW 13.34.030.[41] With regard to V.K.F.'s placement, the court made the following challenged findings:

**2.4 Placement:**

. . . .

It is currently contrary to the child's welfare to return home. The child should be placed . . . for the following reasons:
    [T]here is no parent or guardian available to care for the child. . . .

The child should be placed or remain in:
    Relative placement with [V.K.F.'s maternal grandparents.]. . .

**2.5 Reasonable Efforts:**

. . . .

    The health, safety, and welfare of the child cannot be adequately protected at home.

. . . .

**4.6 Visitation:**

. . . .

    The mother resides in placement's home. Mother's visits are liberal[ly] supervised by the maternal grandmother or maternal aunt. [42]

---

[37] 3 RP at 52.
[38] 3 RP at 58.
[39] 3 RP at 58.
[40] 3 RP at 60.
[41] CP at 97, 99.
[42] CP at 99, 100, 105.

On May 9, 2013, following a dispositional hearing, the trial court entered a dispositional order on dependency.[43] The trial court placed V.K.F. in out-of-home care with her maternal grandmother and required that Galina's visits be supervised by V.K.F.'s maternal grandmother or aunt.[44] The court made challenged factual findings as to placement, which are nearly identical to the contested findings set forth in the dependency order.[45]

On May 30, 2013, the trial court entered findings of fact and conclusions of law.[46] The court made the following relevant uncontested findings:

6. Galina Fraley has been the victim of recurrent domestic violence perpetrated on her by her father, her former husband, and Mark Fraley.

. . . .

8. The testimony that the parents have not had a history of domestic violence between them, where Mr. Fraley is the perpetrator and Ms. Fraley is the victim, is not credible; the evidence and testimony provided by witnesses leads the court to believe that domestic violence has been a recurrent issue between the parents.

9. The child has been exposed to the father's domestic violence perpetrated upon the mother.

. . . .

11. The father is currently in treatment as a domestic violence abuser but that treatment is not complete. It is highly likely that the father will continue to perpetrate domestic violence without continued treatment and court intervention.

12. The mother has been physically abused by her own father, the maternal grandfather. The last time this occurred was almost 14

---

[43] CP at 171.
[44] CP at 174.
[45] CP at 97, 99, 100, 105.
[46] CP at 180.

years ago.

. . . .

16. The court is concerned by what appears to be a pattern of denying domestic violence by the parents. Neither parent is presently capable of safely parenting the child without court supervision: At this time, the court is not confident that if domestic violence occurred prospectively, [the] mother would do anything about it. At this time the court is not confident that the parents would follow through with domestic violence perpetrator and victim services prospectively without the court supervision involved in a dependency. The parents need to follow through with services to help them prevent domestic violence prospectively.

17. Given the dynamics present in the family history, the risks to the child's health, safety, and welfare indicate that comprehensive parenting education are [sic] needed in order for the mother and father to parent safely.[47]

The trial court also made the contested finding that "[t]he mother has mental health diagnoses that negatively impact her ability to parent, especially her ability to be alert to the child's needs and to be physically protective of the child."[48]

Galina appeals.

## ANALYSIS

Galina urges this court to reverse the dispositional order, contending that the trial court abused its discretion by placing V.K.F. in out-of-home care and requiring that Galina's visitation with V.K.F. be supervised. We disagree. The trial court's findings were supported by substantial evidence and its decision was reasonable to ensure V.K.F.'s health, safety, and welfare.

---

[47] CP at 181-82.
[48] CP at 181.

7

When determining an appropriate placement, the best interests of the child are of paramount concern. In re Dependency of R.W., 143 Wn. App. 219, 223, 177 P.3d 186 (2008) (citing RCW 13.34.020). Thus, "[a]lthough parents have a fundamental liberty and privacy interest in the care and custody of their children, a trial court should not allow the rights of the biological parents to override a child's best interests when determining placement under the dependency statute." R.W., 143 Wn. App. at 223-24 (citing RCW 13.34.020; In re Dependency of J.B.S., 123 Wn.2d 1, 8, 12, 863 P.2d 1344 (1993)).

After a court finds a child to be dependent, it must enter an order of disposition. RCW 13.34.130. In this order, the court may order the child removed from the home "if the court finds that reasonable efforts have been made to . . . eliminate the need for removal . . . unless the health, safety, and welfare of the child cannot be protected adequately in the home." RCW 13.34.130(3).

"The trial court has broad discretion and is allowed considerable flexibility to receive and evaluate all relevant evidence to reach a decision recognizing both the welfare of the child and the parents' rights." R.W., 143 Wn. App. at 223 (citing In re the Welfare of B.D.F., 126 Wn. App. 562, 574, 109 P.3d 464 (2005)). Accordingly, a trial court's placement decision in a dependency proceeding is discretionary and will be overturned only upon a showing of an abuse of discretion. In re Dependency of A.C., 74 Wn. App. 271, 275, 873 P.2d 535 (1994). A trial court abuses its discretion when its decision is manifestly

unreasonable or based on untenable grounds. State v. Lormor, 172 Wn.2d 85, 94, 257 P.3d 624 (2011).

Galina asserts that the record does not support the trial court's findings that "[i]t is currently contrary to the child's welfare to return home," and that "[t]he health, safety, and welfare of the child cannot be adequately protected in the home."[49] But ample evidence established that V.K.F.'s welfare would not be protected in Galina's care. Thus, the trial court's decision to order out-of-home placement and supervised visitation was warranted.

In evaluating a claim of insufficiency of the evidence in a dependency proceeding, we determine whether substantial evidence supports the trial court's findings of fact and whether those findings of fact support the trial court's conclusions of law. In re Dependency of C.M., 118 Wn. App. 643, 649, 78 P.3d 191 (2003). Evidence is substantial if, viewed in the light most favorable to the prevailing party, a rational trier of fact could find the fact by a preponderance of the evidence. In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003). We do not reweigh the evidence or evaluate witness credibility. In re Welfare of C.B., 134 Wn. App. 942, 953, 143 P.3d 846 (2006).

Here, the trial court's decision to order out-of-home placement and supervised visitation was primarily based on V.K.F.'s exposure to domestic violence and its resulting risks to her welfare.[50] The court's undisputed findings establish that domestic violence has been a recurring problem between Mark and

---

[49] CP at 99, 100; 172-73.
[50] See CP at 181-82; 4 RP at 47-52, 103.

Galina and that V.K.F. has been exposed to it.[51] It is also undisputed that the parents have denied the existence of a pattern of domestic violence.[52] As a result, if an incident of domestic violence were to occur prospectively, Galina may not take action to protect V.K.F.[53] Significantly, the court made the unchallenged finding that "the risks to the child's health, safety, and welfare indicate that comprehensive parenting education are [sic] needed in order for the mother and father to parent safely."[54] Thus, as the court found, the parents were not capable of safely parenting V.K.F. without court supervision.[55] These undisputed facts, treated as verities on appeal, sufficiently establish that V.K.F.'s welfare would be jeopardized if V.K.F. were placed in Galina's care. See In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001).

Furthermore, testimony adduced at the hearing supported these undisputed findings, as well as the trial court's finding that V.K.F.'s health, safety, and welfare would not be protected if placed in Galina's care. First, abundant evidence indicated a pattern of domestic violence. In addition to the physical assault perpetrated by Mark in October 2012, Galina's voluntary statement reported three months of increasing physical abuse occurring before the October incident. Moreover, May testified that there was verbal violence, emotional violence, intimidation, and actual physical abuse between Mark and Galina.[56] He

---

[51] CP at 181.
[52] CP at 181.
[53] CP at 181-82.
[54] CP at 182.
[55] CP at 181-82.
[56] 3 RP at 58.

also determined that there was a high likelihood that Mark would be abusive in the future without intervention.[57] Further, CPS had concluded that a previous allegation of assault was founded in 2011. Finally, a staff member at a domestic violence clinic testified that Galina sought her assistance on October 23, 2012 to file a protection order.[58]

Second, ample evidence demonstrated Galina's refusal to acknowledge the severity of abuse by Mark. Although Galina signed the voluntary statement that described previous physical assaults by Mark, at the hearing, she repeatedly denied the statements contained therein. She also denied that any acts of domestic violence took place before the October 2012 incident and denied ongoing domestic violence. Further, Galina testified that she had never been fearful of Mark, but she also testified that she had invited her siblings to her house before Mark returned home on October 25 because she was concerned for her safety.[59]

The CPS social workers assigned to the case also provided testimony regarding Galina's denial of domestic violence and the danger this posed on V.K.F. Judy Gischer testified that in 2012, prior to the October incident, she met with Mark and Galina after she received a domestic violence referral.[60] She testified that she offered them domestic violence services but they refused to

---

[57] 3 RP at 58.
[58] 4 RP at 16, 22.
[59] 1 RP at 42, 57.
[60] 2 RP at 57.

11

participate in these services.[61] Julie Turner testified that Galina did not perceive Mark as a threat to her children despite the domestic violence.[62] Turner expressed concern that the continuing incidents of domestic violence posed a threat to Galina's children and that Galina was not protective of them.[63]

Angela Paull also testified that when she initially interviewed Galina about the domestic violence issue, Galina denied any history of it but later admitted that Mark was abusive.[64] Paull testified that she was concerned that Galina was putting herself in danger by continuing her relationship with Mark.[65] Paull believed that Galina's failure to recognize the danger posed by Mark placed V.K.F. in danger.[66]

Finally, at the hearing, May and Paull explained the negative effects that exposure to domestic violence has on a child. May opined that a child who witnesses abuse is likely to become an abuser or a victim when he or she grows up.[67] Paull testified that exposure to domestic violence poses substantial risks to children.[68] According to her testimony, domestic violence negatively impacts all aspects of a child's development: physical, emotional, psychological, behavioral, and social.[69] Further, children affected by domestic violence have more health

---

[61] 2 RP at 58-59.
[62] 1 RP at 145.
[63] 1 RP at 145.
[64] 3 RP 113.
[65] 3 RP at 117.
[66] 3 RP at 117
[67] 3 RP at 57.
[68] 3 RP at 86, 111.
[69] 3 RP at 111.

and behavioral issues than the average child.[70] Paull believed that V.K.F. was at risk of these problems as a result of the domestic violence that occurs between her parents.[71] This was particularly true in light of the fact that V.K.F. had been present for at least two incidents of domestic violence.[72] Finally, because of these risks, Paull believed that it was contrary to V.K.F.'s health, safety, and welfare to return home to either parent at that time.[73]

In sum, the record demonstrates that there is a pattern of domestic violence, that Galina and Mark fail to acknowledge its severity, and exposure to the domestic violence poses a risk to Galina's welfare. Thus, the court's findings that placement with Galina was contrary to V.K.F.'s welfare was more than adequately reflected in the record. These findings also supported the court's decision to order supervised visitation to protect V.K.F.'s health, safety, and welfare.

Nevertheless, Galina contends that no evidence supported the trial court's finding that "[t]he mother has mental health diagnoses that negatively impact her ability to parent, especially her ability to be alert to the child's needs and to be physically protective of the child."[74] We disagree.

The court's uncontroverted findings, amply supported by the evidence, established that Galina's long-standing suffering of domestic violence and her

---

[70] 3 RP at 111.
[71] 3 RP at 111.
[72] 3 RP at 111.
[73] 3 RP at 125.
[74] CP at 181.

denial of such abuse hindered her ability to adequately parent V.K.F.[75] Because of the emotional and physical abuse she suffered during her childhood and in her marital relationships, Dr. Uhl diagnosed Galina with post-traumatic stress disorder.[76] Dr. Uhl also diagnosed Galina with major depressive disorder with catatonic features as well as dissociative fugue.[77] As Dr. Uhl explained in his testimony, "dissociative fugue" is where "a person who has blackouts for specific periods of time where they may function for a certain period of time but not recall functioning at all."[78] Given this evidence and the findings previously discussed, the court properly found that Galina's mental illness would negatively impact her ability to parent.

Galina argues that the trial court could have imposed less restrictive measures to protect V.K.F. from domestic violence. But Galina was residing at V.K.F.'s grandparents at the time of the hearing and the court imposed no temporal restrictions on her contact with her daughter. Furthermore, Galina's visitations were to be "liberal[ly] supervised."[79] These limitations were generous considering the court's finding that Galina was not capable of safely parenting V.K.F.

In light of the evidence concerning the significant risks V.K.F. would face through continued exposure to domestic violence, the trial court's placement decision was in V.K.F.'s best interest. The trial court did not err.

---

[75] CP at 181; 1 RP at 31, 90.

[76] 2 RP at 96-97.

[77] 2 RP at 97.

[78] 2 RP at 98.

[79] CP at 105.

Affirmed.

WE CONCUR: